158 N.J. Super. 424 (1978)
386 A.2d 433
LINDA BROKENBAUGH, PLAINTIFF-RESPONDENT,
v.
NEW JERSEY MANUFACTURERS INSURANCE COMPANY, DEFENDANT-APPELLANT AND CROSS-RESPONDENT, AND STATE OF NEW JERSEY UNSATISFIED CLAIM AND JUDGMENT FUND BOARD, DEFENDANT-RESPONDENT, AND JOSEPH L. DARGAN, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued February 22, 1978.
Decided April 13, 1978.
*426 Before Judges LYNCH, KOLE and PETRELLA.
Mr. C. Kennon Hendrix argued the cause for defendant appellant (Mr. Roy D. Cummins, attorney).
Mr. Kenneth A. DiMuzio argued the cause for plaintiff respondent (Messrs. Falciani & DiMuzio, attorneys).
Mr. William R. Powers, Jr. argued the cause for defendant respondent Unsatisfied Claim and Judgment Fund Board (Messrs. Moss, Powell & Powers, attorneys).
Mr. John L. Fratto argued the cause for defendant respondent Dargan (Messrs. Bleakly, Stockwell & Zink, attorneys; Mr. Fred T. Fitchett on the brief).
The opinion of the court was delivered by LYNCH, P.J.A.D.
Plaintiff, who was injured in an accident on January 6, 1973 while a passenger in an automobile driven by an uninsured motorist, filed a declaratory judgment action against the New Jersey Manufacturers Insurance Company (NJM) and the State of New Jersey Unsatisfied Claim and Judgment Fund (Fund). The complaint alleged that NJM had issued to Carlton Colburn (Colburn) and Gladys Brokenbaugh (Gladys)[1], plaintiff's mother, an *427 automobile policy which was in effect at the time of plaintiff's accident; that plaintiff was a "person insured" by said policy and was entitled to the personal injury protection (PIP) and uninsured motorist coverage (UM) made mandatory in such policies by the New Jersey Automobile Reparation Act of 1972 (reform act), particularly N.J.S.A. 39:6A-4(PIP) and N.J.S.A. 39:6A-14 (UM). Alternatively, plaintiff sought a declaration that "[a]s the victim of an uninsured motorist," she is entitled to file claim against the Fund.
On November 4, 1976 the trial judge found that plaintiff was entitled to coverage under the policy issued by NJM. Following a motion by plaintiff and the Fund to fix the form of judgment, judgment was entered on March 30, 1977 providing, insofar as pertinent, that summary judgment was granted in favor of plaintiff and the Fund against NJM; the complaint against the Fund was dismissed; NJM must reimburse plaintiff for medical bills in the amount of $13,728.80 plus statutory interest of 10% per annum; NJM must pay the attorneys' fees incurred by plaintiff and the Fund. NJM appeals.

The PIP statute.
N.J.S.A. 39:6A-4 provides in pertinent part:
Every automobile liability insurance policy insuring an automobile as defined in this act against loss resulting from liability imposed by law for bodily injury, death and property damage sustained by any person arising out of ownership, operation, maintenance or use of an automobile shall provide additional coverage, as defined herein below, under provisions approved by the Commissioner of Insurance, for the payment of benefits without regard to negligence, liability or fault of any kind, to the named insured and members of his family residing in his household who sustained bodily injury as a result of an accident involving an automobile, * * *. [Emphasis supplied]
Plaintiff contends that she is covered under the statute because she was a member of the "family" of the insured, Colburn, and resided in his household at the time of the accident.
*428 Plaintiff was born July 10, 1952 to James and Gladys Brokenbaugh. James deserted his wife during pregnancy and in June or July 1954 Gladys Brokenbaugh and her daughter, plaintiff herein, began living with Colburn. Gladys never divorced her "first" husband and never married Colburn. In any event, she and Colburn lived as man and wife and eventually produced three offspring of their own. Plaintiff resided with her mother and Colburn until she was 4 1/2 years old. At that time she went to live with her grandmother in Philadelphia and began attending school there. Throughout her residence in Philadelphia, Colburn "contributed weekly to her support" and plaintiff, in turn, would visit her mother and Colburn frequently. She returned to their household sometime during the winter of 1970. From that time to the date of the accident she lived with Gladys and Colburn. Also during that time Colburn provided food, shelter and medical care for Gladys and plaintiff. Both looked solely to Colburn for their support and plaintiff has always called Colburn "Daddy."
At trial, all parties moved for summary judgment. On the issue of PIP coverage the trial judge held in a letter opinion that Linda was covered by the policy as a member of Colburn's "family residing in his household," as provided in N.J.S.A. 39:6A-4.
In making this finding the judge referred to the PIP endorsement to the policy which was approved by the Commissioner of Insurance. The endorsement extends coverage to "eligible injured persons." So far as pertinent, the endorsement reads:
"Eligible injured persons" means:
(a) The named insured or any relative of the named insured * * *

* * * * * * * *

"Relative" means a person related to the named insured by blood, marriage or adoption (including a ward or foster child) who is a resident of the same household as the named insured. [Emphasis in original]
*429 The trial judge held that Linda was a "foster child" of Colburn residing in his household and therefore was covered under the NJM policy for PIP benefits. We agree.
Legislation involving automobile insurance must be liberally construed to give the broadest protection to automobile accident victims consistent with the language of the pertinent statute. N.J.S.A. 39:6A-16; Motor Club of America Ins. Co. v. Phillips, 66 N.J. 277, 293 (1974). And the endorsement approved by the Commissioner is "evidential" in determining the legislative intent. Id. at 286. It is with these guidelines that we seek the legislative intent as to the meaning of the term "members of [the insured's] family."
In Cicchino v. Biarsky, 26 N.J. Misc. 300 (D. Ct. 1948), a landlord sought to evict a tenant to provide an apartment for one he deemed his "foster daughter." The action was brought under the Federal Housing and Rent Act of 1948. The pertinent section of that act, 50 U.S.C.A. Appendix, § 1899(a)(2), reads as follows:
"No action or proceeding to recover possession of any controlled housing accommodations with respect to which a maximum rent is in effect under this title shall be maintainable by any landlord against any tenant in any court, notwithstanding the fact that the tenant has no lease or that his lease has expired, so long as the tenant continues to pay the rent to which the landlord is entitled unless 
"(2) the landlord seeks in good faith to recover possession of such housing accommodations for his immediate and personal use and occupancy as housing accommodations, or for the immediate and personal use and occupancy as housing accommodations by a member or members of his immediate family, * * *."
In Cicchino the "foster-daughter's" parents died while she was an infant and the landlord undertook voluntarily to raise her in all respects as his own. The tenant sought to block the eviction, noting that under the Housing and Rent Act of 1948 a landlord could only evict to provide space for members of his "immediate family." After recognizing that the term "family" has various definitions, the court noted *430 that Congress had defined the term to include "in-laws." Thus, recognizing that the term was not confined to those in a "legal" or blood relationship to the landlord, the court held that the foster-daughter was within the definition of family:
Webster's New International Dictionary (1922) defines:
"foster mother or father  a woman or man who has performed the duties of a parent to the child of another by rearing the child as own child."
And
"foster child * * * one who has received the care of a foster parent."
"foster brothers or sisters  those reared as children in the same family, or nursed at the same breast, but not of the same parentage."
It is not necessary, for the purposes of this case, that an all inclusive definition of immediate family be formulated. It is sufficient to determine that a foster child reared from infancy to womanhood by the foster parent in his home and still a member of his household, is a member of his immediate family within the meaning and intent of the statute. [26 N.J. Misc. at 304]
In our view the trial judge's reliance on Cicchino is warranted. Here, as in Cicchino, there are indications that the definition of the term "family" is not confined to those who stand in a legal or blood relationship. By using the terms "ward" and "foster child," the Commissioner indicates that family shall include those who live within the domestic circle of, and are economically dependent on, the named insured. Such is the circumstance of plaintiff and Colburn. The undisputed facts below show that plaintiff was dependent on Colburn in all respects and viewed him as a father.
NJM places great stress on the fact that plaintiff's mother and Colburn had never married. However, that should not affect the relationship which plaintiff had with Colburn in this context. In Moore Shipbuilding Corp. v. Industrial Acc. Comm'n, 185 Cal. 200, 196 P. 257 (Sup. Ct. 1921), the court held that the child of a woman who was living adulterously with decedent was entitled to compensation benefits on *431 his death. The statute provided benefits to those who lived in decedent's "family or household." The court noted that the purpose of the statute was to provide compensation for those dependent on the worker and that, from this standpoint, it made no real difference where the dependency arose. The court held:
The only question open to discussion is whether as a matter of law the relation shown by the undisputed evidence constitutes bona fide membership in a "family or household" on the part of the claimant. There is little to be gained by reviewing the numerous definitions given by the courts and lexicographers of the words "family" and "household." They mean different things under different circumstances. The family, for instance, may be an entire group of people of the same ancestry, whether living together or widely separated; or it may be a particular group of people related by blood or marriage, or not related at all, who are living together in the intimate and mutual interdependence of a single home or household. Again, the word "household" is variously used to designate people, generally, who live together in the same house, including the family, servants, and boarders; or it may be used as including only members of the family relation. It is probable that the two terms are coupled together in this statute to indicate that they are used synonymously, the "family" to include only those of the household who are thus intimately associated, the "household" to exclude those of the family not living in the home. There can be no doubt that Bauer, Mrs. Miller, and the little girl constituted a family or household. They were living together in all the interdependency and intimacy of man and wife and their legitimate off-spring. [196 P. at 259-260]
The court added that the character of the relation between the child's mother and decedent should not prejudice the child. Id. at 260. See also, Piccinim v. Connecticut Light & Power Co., 93 Conn. 423, 106 A. 330, 331-332 (Sup. Ct. Err. 1919); Scott's Case, 117 Me. 436, 104 A. 794, 797 (Sup. Jud. Ct. 1918).
In any event, the term "family" is variable and capable of different definitions depending on the context in which it is used. Tepper v. Royal Arcanum, 61 N.J. Eq. 638, 642 (E. & A. 1900); Cicchino, supra; LeRoux v. Edmundson, 276 Minn. 120, 148 N.W.2d 812, 814 (Sup. Ct. 1967); Tomlyanovich v. Tomlyanovich, 239 Minn. 250, 58 N.W.2d *432 855, 857 (Sup. Ct. 1953); cf. Mazzilli v. Acc. & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 8 (1961). Some jurisdictions, for the purposes of "family exclusion" provisions, have interpreted the term to include only blood relations. Henderson v. State Farm Mut. Auto. Ins. Co., 59 Wis.2d 451, 208 N.W. 2d 423, 427 (Sup. Ct. 1973); Hicks v. Hatem, 265 Md. 260, 289 A.2d 325, 328 (Ct. App. 1972).
However, in LeRoux v. Edmundson, supra, the court found that the insured's stepchildren were part of his family, even though they had been born out of wedlock to his wife and another man. (The case involved a "family exclusion" provision). The court noted:
Under the facts disclosed by the evidence, it is apparent that Edmundson, his wife, and the eight children lived together as a family group. The six children were members of the mother's family and her household. When she married Edmundson, her children, no less than herself or the two children born after their marriage, became a part of his household and his family. His contributions in money and services were to the family as a group. There is no evidence of any significant difference in his care and treatment of his stepchildren and his own children. Rather, the intimacy helpfulness and concern of each member of the household toward each other, characteristic of the relationship between parents and their natural children, existed during the period they lived together. Although the Ellsworth children did not refer to Edmundson as their father, the group formed a family circle, and there is no reason to believe that Edmundson's resistance to a claim by his stepchildren would differ from a claim made by the children of his marriage to Elaine. Under the circumstances, the Ellsworth children, although illegitimate, were Edmundson's stepchildren. No cases have been found which apply this exclusion to stepchildren. Attaching primary importance to the factor of a close domestic relationship, other courts have held that blood relationship is not a necessary factor. [148 N.W.2d at 814-815]
Indeed, stepchildren are routinely found to be "members of the family" for insurance purposes. See, e.g., Tepper v. Royal Arcanum, supra; Tencza v. Aetna Cas. & Sur. Co., 21 Ariz. App. 552, 521 P.2d 1010 (App. Ct. 1974). The analysis of LeRoux, although involving an exclusion, is applicable to the case at bar. It would not seem that the *433 policies of the act would be advanced in any respect by narrowly interpreting "family." See Automobile Insurance Study Commission Report, Recommendation (1.1) which suggested PIP coverage for the named insured and "members of his household."
Further, there appears to be no logical reason why "family" should be limited to blood relations. It would appear that all the policy factors which prompted the use of the term in the reform Act apply as well where, as here, the parties live in a domestic circle and recognize reciprocal duties of care and support. Under the facts of this case  not controverted by NJM  we conclude that plaintiff was a member of the family of Carlton Colburn at the time of the accident and coverage for PIP benefits should be extended to her. The decision of the trial court in that respect is affirmed.

UM coverage.
In his letter opinion the trial judge held that plaintiff was entitled to Uninsured Motorist coverage for the same reasons that he found her entitled to PIP coverage. We reach the same result but with a slightly different analysis.
N.J.S.A. 39:6A-14 declares that every owner or registrant of an automobile registered or principally garaged in New Jersey shall maintain uninsured motorist coverage as provided in N.J.S.A. 17:28-1.1. It is significant that the Automobile Insurance Study Commission which recommended the Reparation Reform for New Jersey Motorists (reform act), considered uninsured motorist coverage as an integral part of their proposal. Prior to their study it was not mandatory that such coverage be maintained. It merely had to be offered by the company (N.J.S.A. 17:28-1.1; L. 1968, c. 385, § 2) and the insured could either accept or reject the offer (N.J.S.A. 17:28-1.2; L. 1968, c. 385, § 3). The Commission's report recommended:

*434 Recommendation 8. Revised Uninsured Motorist Coverage

(8.0) Uninsured motorist coverage in increased limits of $15,000/$30,000 for bodily injury and $5,000 for property damage shall be made mandatory on all compulsory automobile liability insurance policies (section 2.0) in addition to the PIPC (no-fault) benefits provision (section 1.0). This coverage is to contain an insolvent insurer clause.

Purpose: A compulsory PIPC (no-fault) and liability insurance program together with an expanded Unsatisfied Claim and Judgment Fund should assure all New Jersey citizens of comprehensive injury reparation for accidents occurring in New Jersey.
Accordingly, almost contemporaneously with the adoption of the reform act the Legislature amended N.J.S.A. 17:28-1.1 to eliminate the "offer" of UM coverage, made such coverage mandatory and repealed N.J.S.A. 17:28-1.2. Thus it is apparent that PIP and UM coverage were both part of one "insurance package" aimed at providing the broadest protection for all persons injured in accidents occurring in New Jersey. As such, the statutes providing such coverage are in pari materia. 2A Sutherland, Statutory Construction (4 ed. 1973), § 51.01 to § 51.03.
The UM statute mandates coverage for "payment of all or part of the sums which the insured or his legal representative shall be legally entitled to recover as damages * * *." The endorsement related to UM coverage provides: "Each of the following is an insured under this insurance to the extent set forth below: (a) the named insured and any designated insured and, while residents of the same household, the spouse and relatives of either." By virtue of the liberal construction to be accorded to UM provisions, Motor Club of America Ins. Co. v. Phillips, supra, 66 N.J. at 293, and the fact that PIP and UM coverage are in pari materia as having the same purpose of broad protection, we conclude that the term "relatives" under UM coverage shall be construed in the same manner as in the PIP endorsement. Accordingly the definition of "relative" under the latter, i.e. that it includes a "foster child," should likewise be taken *435 as its meaning under UM coverage. We therefore affirm the trial judge's decision affording her that coverage.

Statutory interest.
N.J.S.A. 39:6A-5(b) declares that PIP benefits payments shall be overdue if not made "within 30 days after the insurer is furnished written notice of the fact of a covered loss and of the amount of same." N.J.S.A. 39:6A-5(c) states that overdue payments shall bear interest at the rate of 10% per annum.
In the case at bar, defendant NJM does not disclaim entirely liability for interest, but contends that it should not be held liable for interest during the period from February 27, 1976  the date of argument on the parties' motion for summary judgment  to February 11, 1977  the date on which plaintiff moved for an order to fix the form of judgment. We disagree.
Defendant's contention that it should not be held liable for statutory interest during periods of "delay" occasioned by the trial judge's failure to issue an opinion is novel within the State. However, those cases which have considered N.J.S.A. 39:6A-5(b) have held that the insurer has an "absolute obligation" to pay the proffered bill within 30 days or "to establish that it is not responsible for its payment." Hagains v. Government Employees Ins. Co., 150 N.J. Super. 576, 583 (Law Div. 1977). The presence or absence of good faith on the part of the insurer in not making payment is immaterial. Ortiz v. Safeco Ins. Co., 144 N.J. Super. 506, 509 (App. Div. 1976), certif. den. 73 N.J. 63 (1977). We therefore find NJM's contention, regarding statutory interest, to be without merit.

Defendant Dargan.
At trial plaintiff amended her complaint to state a cause of action against Joseph L. Dargan. Dargan was the insurance agent who processed Colburn's application for insurance *436 with NJM. Plaintiff claimed that Dargan, as an "agent" of NJM, represented that her mother was a "named insured" under the policy, thereby entitling her to PIP and UM coverage as the "relative" of a named insured. Plaintiff also sought reformation of the contract to reflect this representation. Thereafter, NJM filed a cross-claim against Dargan for indemnity. The trial judge denied Dargan's motion for summary judgment "in view of NJM's cross-claim which raises factual issues as to said defendant's authority * * *."
We note that the cross-claim was based upon the allegations of the amended complaint, i.e., defendant Dargan's alleged misrepresentations as to coverage. However, because the judgment below and our decision in this appeal is that NJM is liable under the terms of its policy, and not by reason of any misrepresentations by Dargan, it follows that Dargan's motion for summary judgment should have been granted. To this extent, the judgment below is reversed.

Conclusion.
For the foregoing reasons the judgment is affirmed as to the liability of NJM under the terms of its policy and reversed as to the denial of summary judgment on behalf of defendant Dargan.
NOTES
[1] However. Colburn was the "named insured." Gladys was not.