**Marvin HAYES and Kathryn Sharp,
Plaintiffs–Respondents,**

v.

**AMERICAN STANDARD INSURANCE
COMPANY, Defendant–Appellant.**

**No. 18196.**

Missouri Court of Appeals,
Southern District,
Division One.

Feb. 1, 1993.

James D. Sickal, Waynesville, for defendant-appellant.

Tyce S. Smith, Sr., Smith, Hutcheson and Dunbar, Waynesville, for plaintiffs-respondents.

SHRUM, Judge.

The issue in this case is whether a deceased child, reared by plaintiff Marvin Hayes as his own although not related to him by blood, marriage, or formal adoption, was covered under the uninsured motorist provisions of two automobile insurance policies issued by the defendant, American Standard Insurance Company of Wisconsin, to Marvin.[1] The trial court found there was coverage, and American Standard appeals. We conclude that the child is Marvin's "foster child" and the policies provide coverage. We affirm.

FACTS

The record supports the following facts as found by the trial court. On October 31, 1987, 13–year–old Elizabeth Sharp was fa-

---

**1.** For convenience, we refer to the plaintiffs by their first names.

tally injured in an automobile accident which occurred as she was a passenger in an uninsured motor vehicle.

At the time of her death, Elizabeth lived with her natural mother, Kathryn Sharp, and Marvin in the same household. Although Marvin and Kathryn had cohabited since February or March 1977, they never married. Elizabeth was not related by blood or marriage to Marvin, nor had Marvin adopted Elizabeth or been appointed her guardian or curator. However, Marvin participated in parental decisions and functioned as a parent of Elizabeth while she lived in his home; he disciplined her, cared for her, nurtured her, and participated in recreational events with her. Marvin thought of Elizabeth as his daughter and referred to her as such. In turn, Elizabeth called Marvin "Father" or "Daddy" and treated him as her father.[2] Marvin was listed as "guardian" on one of Elizabeth's school records, and on one of her hospital records he was identified as her "stepfather."

After Marvin and Kathryn began living together, they deposited all money they received into a bank account bearing both their names, and they paid all their bills from that account. Deposits into the account consisted of the monthly VA benefit ($156) and Social Security check ($153) received by Kathryn as her separate entitlement, the checks received monthly by Kathryn for Elizabeth's benefit ($78 VA; $153 Social Security), and Marvin's salary from employment at a sawmill ($160 a week). Some of Marvin's earnings were used to support Elizabeth, because the money received by Kathryn and Elizabeth was not sufficient to pay all their living expenses. On his state and federal income tax returns for 1979–1986, Marvin listed Elizabeth as a dependent.[3]

When Marvin applied to American Standard for insurance, he listed Elizabeth in the section designated "nondriving children under age 16 residing with applicant." American Standard issued policies on two vehicles to Marvin. Each policy provided uninsured motorist coverage; the uninsured motorist section of the policies defined "insured person" to include "a relative," and each policy defined "relative" as "a person living in your household, related to you by blood, marriage or adoption. This includes a ward or foster child. It excludes any person who, or whose spouse, owns a car."

Marvin and Kathryn sued American Standard for the wrongful death of Elizabeth and for additional damages under the uninsured motorist provisions of the policies issued to Marvin. By a counterclaim, American Standard sought a declaratory judgment that Elizabeth was not insured under the policies' uninsured motorist provisions. Trial was held on American Standard's counterclaim.

Relying on *Busby v. Ranger Insurance Company*, 708 S.W.2d 795 (Mo.App.1986), the trial court concluded that Elizabeth was "a defacto foster child of Marvin Hayes and as a matter of law was a 'foster child' as included in the definition of 'relative' defined in [the] policies ... and therefore was an insured...."

The parties subsequently agreed to entry of a consent judgment whereby Marvin dismissed his petition and American Standard agreed to pay Kathryn $45,000 in the event the issue of coverage for Elizabeth under Marvin's policies was ultimately decided against American Standard. American Standard then brought this appeal.

## DISCUSSION AND DECISION

■ American Standard presents two points relied on under which it argues *Busby* should be limited to its facts or should not be followed. We will discuss the points

---

2. Elizabeth's biological father, Jerry Sharp, died in February 1977. Despite her references to Marvin as her father, Elizabeth continued to use the name Sharp for all purposes, including school enrollment.

3. On April 3, 1982, Marvin filed an amended federal tax return in which he explained the reason for amending as follows: "Amending to file as head of the household for child who I treat as my own who lives with me all year and has for 5 years. I should have showed her on line 6(c) instead of 6(d)."

on appeal together after we examine *Busby* in detail.

In an equitable garnishment proceeding, the trial court in *Busby* awarded the parents of Christine Busby, who was killed in an automobile accident, the proceeds of an insurance policy issued by Ranger Insurance to Willard and Celestine Barebo, alleged foster parents of Thomas Barebo, the driver of the automobile. The issue on appeal was whether Thomas was a ward and/or a foster child of the Barebos. 708 S.W.2d at 795.

Coverage under the policy issued to the Barebos by Ranger was afforded to " 'any covered person,' " a term defined, in part, as " 'any family member.' " "Family member," in turn, was defined as " 'a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child.' " 708 S.W.2d at 796. The *Busby* opinion describes the relationship between Willard and Celestine Barebo and Thomas Barebo:

Thomas Barebo was not the natural son of the Barebos. He was born on September 22, 1956, to Helen Strickwerda and Francis Callaghan, and was named Thomas Callaghan. He came to the Barebos on October 1, 1956, when he was 13 days old. While they never legally adopted him, Thomas was referred to and raised by the Barebos as their son. He was baptized Thomas Barebo, and enrolled in school under that name. Thomas himself used the name Thomas Barebo in all transactions, and throughout his life, and referred to the Barebos as his mother and father. He was living with the Barebos on the date of the accident, having moved back to their home two weeks prior to the accident.

708 S.W.2d at 795–96.

Ranger argued that Thomas was not a "family member," and, therefore, was not covered by the policy. The court disagreed.

While Thomas cannot be considered a natural or adopted member of the Barebo family, the definition of "family member" contained in the insurance policy is not so limited. Coverage is expressly extended to "foster children" and "wards" and is not expressly limited to those situations where this status is conferred by legal appointment or placement. Thomas was raised by the Barebos as their son even though he was not their natural child. He obviously meets the definition of a foster child of the Barebos. *See* Webster's Third New International Dictionary 876 (1976). As a *de facto* foster child, he was covered by the policy. *See Hartman v. Insurance of North American,* 106 Mich.App. 731, 308 N.W.2d 625, 628–29 (1981); *James by Robertson v. Allstate Insurance Co.,* 201 N.J.Super. 299, 493 A.2d 28, 30–31 (N.J.Super.A.D., 1985); *Brokenbaugh v. New Jersey Manufacturer Insurance Co.,* 158 N.J.Super. 424, 386 A.2d 433, 434–37 (N.J.Super.A.D., 1978) [96 A.L.R.3d 793 (1980)]; *Cobb v. State Security Insurance Co.,* 576 S.W.2d 726, 728, 737 (Mo.banc 1979).

*Busby,* 708 S.W.2d at 796.

To determine that Thomas Barebo was a family member and, therefore, covered by the insurance policy, the *Busby* court relied on a definition of *foster child* drawn from *Webster's Third New International Dictionary* (1976). That dictionary defines *foster* as follows: "foster ... (as first constituent in such terms as ... foster mother,.... foster child) ...: affording, receiving, or sharing nourishment, upbringing, or parental care though not related by blood or legal ties: as ... brought up by someone other than one's natural parent...." *Id.* at 897.[4]

In its challenge to the applicability of *Busby* to this case, American Standard argues that *foster child* has "a clear and settled meaning in the law and ... [is] not ambiguous." As examples of the "clear and settled meaning in the law" of *foster child,* American Standard points to various sections of RSMo chapters 208, 210, and

---

**4.** The *Busby* opinion cites to page 876 of *Webster's Third New International Dictionary* (1976). We find the page number to be 897.

211 that refer to foster children, foster parents, and foster homes, and to various definitions drawn from *Black's Law Dictionary, American Jurisprudence 2d,* and *American Law Reports.*

We disagree with American Standard's assertion that *foster child* is not ambiguous as it is used in the policies issued to Marvin. In *Krombach v. Mayflower Ins. Co.,* 827 S.W.2d 208 (Mo.banc 1992), the court set out these principles concerning the question of whether an ambiguity exists in an insurance policy:

> An ambiguity arises when there is duplicity, indistinctness, or uncertainty in the meaning of words used in the contract. Language is ambiguous if it is reasonably open to different constructions[,] and the language used will be viewed in the meaning that would ordinarily be understood by the layman who bought and paid for the policy.

*Id.* at 210[2] (citations omitted).

In *Busby,* coverage under the policy was "not expressly limited to those situations where [foster children] status is conferred by legal appointment or placement." 708 S.W.2d at 796. Likewise, the policies issued to Marvin do not circumscribe the meaning of *foster child.*[5] Thus, the term *foster child* in the policies is "reasonably open to different constructions," namely the construction urged by American Standard and the broader meaning ascribed to the term by the *Busby* court and applied in this case by the trial court. Therefore, we view the term as it would "ordinarily be understood by the layman who bought and paid for the policy." *Krombach,* 827 S.W.2d at 210[2]. For a layperson's understanding of a term, it is appropriate for us to consult a general dictionary of the English language. *See, e.g., Kuyper v. Stone County Comm'n,* 838 S.W.2d 436, 437–38 (Mo.banc 1992); *Buechner v. Bond,* 650 S.W.2d 611, 613[4] (Mo.banc 1983). We hold that the term *foster child* would ordinarily be understood by a layperson to mean what the above-quoted definition

from *Webster's Third New International Dictionary* says it means.

In light of the above-quoted definition of *foster child* and the record before us, we conclude that the trial court correctly determined that Elizabeth was Marvin's foster child. Although unrelated to Elizabeth by blood or legal ties, Marvin afforded and shared in her nourishment, upbringing, and parental care. It is of no consequence that Marvin was not the sole source of Elizabeth's economic support. It is enough that he *shared* in that support. The fact that Kathryn and Marvin were not married, whereas the foster parents in *Busby* were married, is of no consequence. "[T]he only pertinent inquiry is into the relationship between the named insured and the child." *Joseph v. Utah Home Fire Ins. Co.,* 313 Or. 323, 835 P.2d 885, 889 (banc 1992). Upon making that inquiry, we find ample evidence to support the trial court's finding that a "foster" relationship, as described in *Busby* and defined in *Webster's Third New International Dictionary,* existed between Marvin and Elizabeth.

American Standard argues that any foray into the meaning of *foster child* is inappropriate where, as here, the question involved is "whether or not a person comes within the definition of an 'insured' within the policy. . . . It is only after one has been determined to be an 'insured' that any ambiguous words or policies are to be construed against the 'insurer.'" For this argument, American Standard relies on *Brown v. Shield Fire Ins. Co.,* 260 S.W.2d 337 (Mo.App.1953); 44 C.J.S. *Insurance* § 308 (1945); and 43 Am.Jur.2d *Insurance* § 285 (1982). *American Jurisprudence 2d* states the principle thus:

> The general rule that doubtful language contained in an insurance policy is to be construed in favor of the insured and against the insurer, operates only after the insured has been determined and not in deciding whether a certain individual

---

5. We offer no opinion concerning the public policy implications of such a restricted definition in an insurance policy.

belongs to the insured class described in the policy....

*Id.* at 362.

We reject American Standard's argument for several reasons. First, we find no opinion of a Missouri appellate court that embraces the above-quoted "rule" as formulated in the encyclopedias, although in American Standard's case of *Brown v. Shield Fire Ins. Co.*, the court of appeals appears to have engaged in the process described in the "rule" in that it determined as a matter of law (and with no citation to authority) that the word *family* as used in a fire insurance policy "must have meant persons of the insured's household bearing some kinship to her." 260 S.W.2d at 338. We note, however, that the *Brown* court, in determining the meaning of *family*, pointed out that "[n]o case has been called to our attention where a meretricious relationship has been graced by the name of 'family'...." *Id.* In the case before us, *Busby* was called to the attention of the trial court, so arguably the trial court followed the procedure of the "rule" asserted by American Standard to reach the conclusion American Standard now challenges. We also question the present vitality of the *Brown* court's restricted definition of *family* and its method of arriving at that definition. *See, e.g., Mission Ins. Co. v. Ward*, 487 S.W.2d 449, 451 (Mo.banc 1972), and *Giokaris v. Kincaid*, 331 S.W.2d 633, 640 (Mo.1960), cases in which our supreme court consulted not only case law but also dictionaries to arrive at a different meaning of *family*.

Second, if the "rule" were adopted in Missouri, we believe it illogical to apply it to a situation where the identity of an insured cannot be determined without first resolving the ambiguity.

Third, the "rule," applicable to Missouri or not, appears satisfied in the case before us. The policies issued to Marvin define

*insured person* to include a "relative," a term that includes a "foster child." Thus it can be determined from the policy definition of *insured person* that any foster child of Marvin is an insured person under the policies. Under the "rule," this determination would make it appropriate to resolve the ambiguous meaning of the term *foster child.*

The use of a dictionary definition of *foster child* is by no means novel. For example in *Brokenbaugh,* 386 A.2d 433, the question presented was whether there was coverage for a child the insured had reared. As here, the child was the daughter of a woman with whom the insured cohabited but had not married. The policy provisions, similar to those in this case,[6] had been approved by the state insurance commissioner. The trial court found that the child was the insured's "foster" daughter and, thus, a "family member"; the appellate court affirmed. After setting out dictionary definitions of "foster child," the appellate court concluded:

> By using the term ... *"foster child,"* the Commissioner indicates that family shall include those who live within the domestic circle of, and are economically dependent on, the named insured.

*Brokenbaugh,* 386 A.2d at 436.

Other courts have adopted definitions of *foster child* similar to those found in *Busby* and in *Brokenbaugh.* For example, in *Joseph,* 835 P.2d 885, a child received serious injuries when struck by an uninsured motor vehicle. At the time of the accident the child and her biological mother were cohabiting with an insured to whom the mother was not married. The insured had reared the child from the time she was five months old, and he was the only "father" she had known. Under the policy language the child was covered if she was a "foster child."[7] The Supreme Court of Oregon

---

**6.** In *Brokenbaugh,* coverage was extended to "The *named insured* or any *relative* of the named insured * * * *'Relative'* means a person related to the *named insured* by blood, marriage or adoption (including a ward or foster child) who is a resident of the same household as the *named insured."* 386 A.2d at 435 (emphasis in insurance policy.)

**7.** In *Joseph* the uninsured motorist section of the policy provided that a "covered person" was the named insured plus any "family member." The policy's general definition section defined

found there was coverage, stating, "In the common understanding, the defining relationship is one of nurturing, supporting, rearing—one of fostering—and not necessarily a 'legal relationship.'" *Id.* at 888.[8] In answer to the insurance company's argument that the child was "not a 'foster child,' because her mother also lives in the household, whereas a foster child is one reared exclusively by non-biological parents," the *Joseph* court said:

Again, the common understanding [of "foster child"] is not so limited.... [T]he only pertinent inquiry is into the relationship between the named insured and the child. The relevant provisions of the policy define covered persons based on a relationship *to the named insured* because of blood, marriage, adoption, or the status of a ward or foster child. Similarly, the definitions that we have cited focus on the relationship between the child and the person who performs the duties of a parent by rearing the child as his or her own, not the relationship between the child and his or her biological parents.

835 P.2d at 889 (emphasis in original). *See also Houston v. National General Ins. Co.*, 817 F.2d 83, 85–86 (10th Cir.1987) (citing *Busby, Brokenbaugh,* and *Hartman,* 308 N.W.2d 625, with approval).

American Standard makes additional arguments that do not require extended discussion. First, American Standard identifies numerous additional factual differences between *Busby* and the case before us. We see no legal significance to the additional factual distinctions American Standard has identified.

Second, American Standard discusses at some length the *Busby* court's use of the term *de facto foster child.* We do not read *Busby* to create a separate category of foster child. Rather, we understand the *Busby* court's use of *de facto* to be nothing more than an indication that the court concluded Thomas Barebo was a foster child in

the common parlance, rather than having had that status conferred on him by legal appointment or placement. In light of our holding that the term *foster child* as used in the policies issued to Marvin is ambiguous and that the meaning of that term as it ordinarily would be understood by a layperson would apply to Elizabeth, we consider the use of *de facto* by the trial court to be surplusage.

Third, American Standard argues that *Busby* should not be followed because the insurance policy in it used the term *family member,* whereas the policies issued to Marvin use the term *relative.* American Standard cites numerous cases for the proposition that *relative* is a more restrictive term than is *family member.* We observe that the definition of *family member* in the policy in *Busby* and the definition of *relative* in the policies in the instant case are virtually identical and each affords coverage for a "foster child." We reject American Standard's argument.

We affirm.

PARRISH, C.J., concurs in result; dissents in part in separate opinion.

CROW, P.J., concurs.

PARRISH, Chief Judge, concurring in result; dissenting in part.

I concur in the result reached. I dissent, however, in the broad conclusion that is stated in the principal opinion "that the child is Marvin's 'foster child.'" I would not extend the meaning that is attributed to "foster child" in this case beyond the meaning of that term as it is used in the particular policy language in this case. Further, in concurring in the result reached, I am compelled to state a difference of opinion with the trial court's assessment that Elizabeth was "a defacto foster child of Marvin Hayes." I do not believe that such a characterization has any meaning.

I base my concurrence on the rationale in *Joseph v. Utah Home Fire Ins. Co.*, 313

"family member" as "'a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child.'" 835 P.2d at 886.

8. Various dictionary definitions of *"foster"* and *"foster child"* are reported in *Joseph,* 835 P.2d at 887–88.

Or. 323, 835 P.2d 885 (1992), which is also cited in the principal opinion. The relationships between the parties in *Joseph* are like those in this case, viz., a child and her natural mother lived in the home of a man to whom the mother was not married. Likewise, a provision in an insurance policy that included uninsured motorist coverage was similar to the language in the policy that is before this court for construction.

The UM section of the policy provides that a "covered person" is the named insured plus any "family member." The policy's general definition section defines "family member" as "a person related to you by blood, marriage or adoption who is a resident of your household. This includes a ward or foster child."

*Id.* 835 P.2d at 886. The *Joseph* court concluded that the policy language was ambiguous because its context was such that "foster child," as used in the policy language, grammatically related back to the term "adoption," although the meaning attributed to foster child is such that a foster child is not related to a foster parent by adoption. *Id.* It held:

In the absence of a different definition in the policy, and in the face of ambiguous provisions in the policy, we conclude that a "foster child" is a child reared by a foster parent-insured who is not its biological or adoptive parent and that a foster parent-insured is a person who has performed the duties of a parent to the child of another by rearing that child as the insured's own. Our holding is limited to construing the term under *this policy*, and we express no opinion as to the meaning of "foster child" in any other context.

*Id.* at 889.

I believe the same assessment that the court made in *Joseph* is applicable here. The facts in *Joseph* are like those in this case both with respect to the relationship of the parties and the language in the insurance contracts.